Landón, J.
The plaintiff complained that on Hovember 22, 1886, the defendant published of and concerning him a certain libel in the New York Times, “containing, among other things, in one part thereof, the false, scandalous, malicious, and defamatory words and matter; that is to say.” Here was set forth a portion of the article. The complaint then proceeded: “And also containing, in another part thereof, the several false, scandalous, malicious, and defamatory words and matters following, of and concerning the plaintiff, that is to say.” Here was set forth another portion of the same article. The complaint then continued, and set forth two other portions of the same article, introducing each portion in the same words as precede the second extract from the article. The answer, in addition to other matters, set forth a justification of each extract from the article complained of. The defendant now contends that the testimony did in fact support the justification of each extract from the article, and that, since there was a general verdict against the defendant, it is impossible to say upon which one of the allegations the jury founded its verdict; and that, if the verdict is against the weight of evidence as to any one of the four 'allegations, it. cannot be sustained. Assuming that the defendant did justify one, and failed to justify all, the paragraphs of the article set forth, it does not follow that the judgment should be. reversed. It is proper to put into one count all the words *157 published at one time, though not those spoken at different times. Hughes v. Rees, 4 Mees. & W. 204; Griffiths v. Lewis, 8 Q. B. 841; Townsh. Sland. & Lib. 597. The defendant cites Cheetham v. Tillotson, 5 Johns. 430. The complaint in that case is in form similar to the one before us. Chancellor Kent held that all the paragraphs separately set forth were complained of collectively, but the majority of the court of errors overruled him. It was a political case, and party spirit ran high. Doubtless the chancellor’s opinion in this case deserves the respect usually accorded to his opinions. If here the whole article had been set forth as constituting one libel, it would have been unobjectionable, (Code Civil Froc. § 535;) but the plaintiff very properly confined his complaint to such portions as reflected upon him. We think the complaint contains only one count. A general verdict is therefore a verdict upon the issues presented, and is sustainable, though some of the paragraphs were justified, if the justification did not cover all of them. The question is, did the plaintiff maintain the cause of action alleged by him, not whether he did it in every particular of alleged grievance or aggravation, but substantially? If so, he stated his case, and maintained it. One libelous paragraph charged, proved, and not successfully defended, is enough for some recovery; if all charged are maintained, the amount of recovery is only enhanced.
We think the verdict is so excessive as to indicate prejudice against the defendant. The New York Times, as was shown upon the trial, and appears from the article itself, published a long article, in which paragraphs reflecting upon the plaintiff occurred, principally for the purpose of rebuking the New York Sun and its proprietors for alleged discourtesy to the family of the late Gen. Grant, and for alleged meddlesome interference in a matter between the plaintiff and Col. F. D. Grant, respecting the payment of a bill for services in connection with embalming the remains of the deceased general, which the plaintiff sought to collect, but which Col. F. D. Grant repudiated as destitute of merit. The evidence tends to show that immediately upon Gen. Grant’s death, on the morning of July 23,1885, at Mt. McGregor, a Mr. Arkell, without authority from the family of the deceased, but with a desire to be useful to them, requested the plaintiff, who was a professional undertaker and embalmer at Saratoga Springs, to take charge of the remains. The plaintiff responded to the request, and, with the appliances of his vocation, proceeded to Mt. McGregor, reaching there at 10 o’clock in the forenoon, and addressed himself to his work. He summoned Dr. McEwen from Saratoga to assist him. Dr. McEwen arrived at about 2 in the afternoon. Meantime Col. F. D. Grant, the eldest son of the deceased, telegraphed to a Mr. Merritt, an undertaker in New York, to perform the like services. Mr. Merritt, with his assistants, reached Mt. McGregor about 6 o’clock in the evening of the same day, and found that the plaintiff had far advanced with the work. The plaintiff surrendered further charge to Mr. Merritt, except that he inspected the remains every day for a few days thereafter. Mr. Merritt was afterwards paid for his services by the government. The plaintiff’s firm presented a bill for their services, including those of Dr. McEwen, at $500, but this bill was not paid. Col. Grant wrote to the plaintiff that “your claim, if you have any, which I do not acknowledge, is properly to be presented to Mr. Merritt, who was alone employed to superintend the preparations for the funeral of Gen. Grant.” No administrators of the estate of Gen. Grant had been appointed, and it appears that the plaintiff’s counsel caused plaintiff’s-bill to be presented to Mr. Arkell. Fublic mention was first made of the matter by an article in the form of a telegraphic dispatch in the New York Sun, of September 30, 1886, in which the plaintiff’s claim and his unsuccessful efforts to collect it, were set forth. In the same paper, and appended to the above dispatch, there was published a notice to the effect that the editor of the Sun would pay the bill upon presentation. On the 6th of October, 1886, the Sun published a long letter, signed by the plaintiff’s firm, giving a version of the *158 matter, and containing, among others, these remarks': “We feel a degree of certainty, however, that if the dead general were now alive, he would see that similar services rendered to his household should not remain long unpaid, nor hesitate to acknowledge a claim in favor of those who performed them. We desire to say, in respect to your offer to pay our bill, if we should send it to you, that we had, and still have, some hesitation about taking the amount from you, as you are under no legal nor moral obligation, so far as we can see, to pay it; but if your offer is still open, and those who we think are legally and morally bound to pay the claim do not sooner recognize their obligation by its payment, we shall be inclined to accept your offer.” One of the editors of the Sun soon afterwards paid the bill to the plaintiff’s firm, and the fact was published in that paper. On the 22d of October, 1886, the Press and Knickerbocker, a newspaper published in Albany, published a letter written by Daniel S. Harrigan, an extract from which forms the libelous paragraph secondly set forth in the complaint. The defendant caused inquiry to be made of Mr. Merritt and others respecting the plaintiff’s connection with the embalming, and the merits of his bill, and thereupon published the article in question.
The first paragraph of which the plaintiff complains is as follows: “No consultation was had with Gen. Grant’s family to determine as to the justice of the demand, although such consultation could easily have been had, and the injustice of the claim been made manifest.” This means that the plaintiff’s claim was unjust, and that the Sun could have ascertained the fact by inquiry of the family. Now, the claim was for $500, and the undisputed evidence was that $100 would have been a fair charge; some of the witnesses saying, “an outside charge. ” The plaintiff adduced no evidence to support the particular charge of $500. It is clear, upon the evidence, that it is an overcharge, unless the fact that Gen. Grant was so distinguished a man justifies a higher charge in his case than in any other involving the same skill and labor. Such a proposition cannot be supported either in law or morals.
The next paragraph complained of is “that the editor of the Sun saw fit to pay a claim that the family of the deceased pronounced blackmailing in color, and in no way meritorious, is a matter in which the public has no concern; but the editor cannot plead that he was unaware of the facts of the case, as Prof. Sullivan and myself notified him, and publication of our letters was refused.” This portion of the article was contained in the letter of Mr. Harrigan, before referred to, as published in the Press and Knickerbocker. The defendant published the whole of the letter. Mr. Harrigan was one of the embalmers employed by Mr. Merritt, and assisted in embalming Gen. Grant’s remains. The charge is libelous, not because it is an actual charge of urging a bill blackmailing in color, and in no way meritorious, but because it imputes such conduct to the plaintiff as has led the family for whom his services were rendered to pronounce it so, whether really so or not, but suggesting that it may possibly be so. The justification of the charge, however, need be no broader than the letter and spirit of the charge itself. The real charge here is that the editor of the Sun saw fit to pay such a bill against the family, without regard to the fact that they pronouced it to be of the character stated.1 The defendant is not called upon to prove that the bill really was of that character, but that the editor of the Sun interfered to pay a family bill which the family thus denounced. The evidence tends to show that the attitude of the family towards this bill had some excuse. They had not employed the plaintiff, they did not acknowledge the justice of his bill, and they had been told by the plaintiff’s letter in the Sun of October 4,1886, that if they did not recognize their legal and moral obligation by paying the bill, the plaintiff would accept payment from the editor of the Sun. It is' not necessary to define “blackmailing in color,” but we can understand that persons sensitive in regard to their private obligations might employ such an expression with re *159 spect to a repudiated bill, when they saw it reinforced by the publication of such a letter.
The remaining paragraphs need not be set forth at large. They charge the plaintiff with intoxication and offensive conduct while at Mt. McGregor, and while engaged in the services for which his bill was rendered. Upon the issue made by the justification of this charge a large amount of testimony was given upon the trial. The question of fact was one for the jury. It was fairly presented to them, and they have found for the plaintiff. We accept their finding. We incline to the opinion that the plaintiff in this respect has suffered inj ustice from the unfair depreciation of his services by the rival embalmers. The plaintiff was entitled to a verdict, but this one for $5,000 is excessive. The plaintiff first rushed into print with the letter of his firm published in the Sun of October 4, 1886. That letter stated an odious comparison between the dead and living members of the same family; it imputed to the living members a failure to recognize their legal and moral obligations; it threatened, in case they failed to pay the plaintiff’s bill, to inflict upon them whatever pain and stigma might result from its payment by-the editor of the Sun. Under such circumstances, the plaintiff is to be accorded the consideration due to a party who, making the onset, is too vigorously repulsed. Elliott v. Brown, 2 Wend. 497. We think a verdict for $2,000 would have been ample. We therefore order a new trial, unless the plaintiff shall stipulate to reduce the verdict to that sum, and the extra allowance accordingly; and, upon the filing of such stipulation within 20 days after service of a copy of this order, the judgment so modified is affirmed, with costs.
Learned, P. J„ and Ingalls, J., concur.